**AFFIRMED and Opinion Filed January 24, 2020**



In the

# Court of Appeals
# Fifth District of Texas at Dallas

**No. 05-19-01068-CV**

**IN THE INTEREST OF G.D.P., JR., A CHILD**

**On Appeal from the 296th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 296-30053-2018**

# MEMORANDUM OPINION
Before Justices Pedersen, III, Reichek, and Carlyle
Opinion by Justice Carlyle

Mother appeals from the trial court's judgment terminating her parental rights to G.D.P., Jr.[1] Mother contends: (1) the evidence was legally and factually insufficient to support termination under section 161.001(b)(1) of the Texas Family Code; (2) the evidence was legally and factually insufficient to support a finding that termination was in the child's best interest; and (3) the trial court abused its discretion by appointing a nonparent as a conservator. We affirm and, because the issues are settled in law, issue this memorandum opinion. *See* TEX. R. APP. P. 47.4.

## Background

In late February 2018, the Texas Department of Child Protective Services (the Department or CPS) received a referral alleging negligent supervision of then two-week-old G.D.P. The

---

[1] The trial court also terminated the rights of various potential fathers, but they are not part of this appeal. For convenience, and because no other person discussed in this opinion has the same initials, we have dropped "Jr." from our references to the child elsewhere in this opinion.

Department recently had removed one of Mother's other children because of methamphetamine use, and Mother's hair tested positive for the drug while she was pregnant with G.D.P. The Department thus served Mother with an emergency notice of removal concerning G.D.P. in March 2018. Mother did not cooperate with the Department's removal efforts, but G.D.P. was removed by law enforcement and placed in foster care.

A few days after the removal, the Department filed an original petition seeking a temporary order appointing it as G.D.P.'s conservator. Mother did not appear at the April 2018 hearing (or any of the proceedings in the case), and the trial court entered the temporary order. Later that month, the Department filed its "Family Service Plan," which the trial court incorporated by written order following each subsequent pre-trial hearing in the case. The plan provides April 29, 2019 as the "TARGET DATE" for reunification and states:

> [Mother] needs to provide a form of contact with CPS and ability to contact her attorney. . . .
>
> [Mother] must maintain, suitable, stable, legal employment. [Mother] must provide CPS caseworker Jenni[2] with copies of paycheck stubs as evidence of employment. [Mother] must notify CPS caseworker of any jobs changes within 24 hours. . . .
>
> [Mother] must maintain stable, suitable housing. [Mother] must allow CPS caseworker and CASA worker to enter home at anytime and have access to [G.D.P.] at all times. [Mother] must provide CPS caseworker with address changes. . . .
>
> [Mother] must complete random drug & alcohol urinalysis/hair strand tests and oral swabs. CPS caseworker will contact [Mother] and instruct her to complete any type drug test requested at a location given within that same day; between the hours of 8am-5pm.
>
> Fas-Tes Labs of Plano
> 1104 Summit Ave. Plano, TX 75074
> PHONE: 469-661-9020
> Monday-Friday 9am-12pm and 1pm-5pm.
>
> [Mother] must attend, participate, and complete a drug/alcohol assessment and follow all recommendations. [Mother] must attend, participate, and successfully complete an inpatient drug/alcohol treatment program approved by CPS and follow

---

[2] Jennifer ("Jenni") Smith's contact information was provided elsewhere in the Family Service Plan.

–2–

all after-care recommendations. LifePath Systems will recommend which drug/alcohol program is best for [Mother] after completion of drug/alcohol assessment. [Mother] must contact LifePath to schedule a drug/alcohol assessment and sign a release of records/information for CPS to obtain results and information regarding [Mother's] assessments.

LifePath Systems
7308 Alma Dr. Ste #500
Plano, TX 75025
Phone: 972-422-5939

[Mother] must attend, participate and complete individual counseling sessions through LifePath Systems. [Mother] must contact LifePath Systems and schedule to attend individual counseling. [Mother] must sign a records/information release form for CPS to obtain results and information of [Mother's] participation, attendance and progress of the counseling sessions.

LifePath Systems
7308 Alma Dr. Ste #500
Plano, TX 75025
Phone: 972-422-5939

[Mother] must provide CPS Caseworker, Jenni Smith with a list of all prescription medications and over the counter medications. [Mother] must notify CPS Caseworker, Jenni in writing of any medication changes.

Psychological evaluation or psycho social evaluation as recommended by CPS. [Mother] must contact Dr. Lara Hastings' office to schedule a psychological evaluation.

Dr. Lara Hastings
6860 N. Dallas Pkwy, Ste #200, Plano, TX 75024
Phone: 214-702-6834

[Mother] must attend, participate, and complete Parenting Education classes as recommend [sic] by CPS. [Mother] must sign a records/ information release form for CPS to obtain her information while attending the parenting education classes.

Hope's Door offers Parenting classes weekly. [Mother] must contact Hope's Door and schedule to attend the parenting classes.

Hope's Door
860 F Ave. Ste #100, Plano, TX 75074
Phone: 972-422-2911

The Department amended its petition in December 2018 to seek termination of Mother's parental rights, and a trial was held in August 2019. At the trial, CPS investigator Katelyn Kaske

testified she contacted Mother by phone when she first received the referral concerning G.D.P. Mother would not give her any information about where she was living at the time, but investigators eventually located her.

Kaske went with law enforcement to the home where Mother was living to serve the emergency removal order. Although Mother initially denied the child was there, she eventually brought him out onto the porch. Kaske began asking her questions both about the child and her drug use. Mother admitted using methamphetamine in November or December of 2017, but she denied she was currently using drugs. Upon further questioning, Mother became belligerent and told Kaske to leave. Kaske testified the Department was concerned about leaving G.D.P. with Mother because: (1) Mother recently tested positive for drugs in another case while pregnant with G.D.P.; (2) Mother was not cooperating with the Department and would not allow it to assess her current living conditions; (3) law enforcement told the Department Mother was living in a "known drug house"[3]; and (4) Mother's initial attempt to deny G.D.P. was at the home indicated it might be difficult to locate him in the future.

Kaske testified that after law enforcement removed the child, Mother did not respond to any of her attempts to schedule visits. And Mother only contacted her once—to apologize for being belligerent and to ask about the next steps in the process. In Kaske's opinion, Mother endangered G.D.P. by using drugs and by "placing him in an environment known for drug use." Kaske acknowledged she had no information suggesting G.D.P. tested positive for drugs or required "any kind of special services as a result of potentially being exposed to any kind of drugs while in utero." She further conceded that, after Mother emerged from the house with the child, she was holding

---

[3] Over Mother's hearsay objection, the trial court admitted testimony that law enforcement told the Department Mother was residing at a "known drug house." But that testimony was admitted for the sole purpose of establishing why the Department was concerned about G.D.P.'s welfare; the trial court ruled it would not consider the testimony as evidence that the house was, in fact, a "known drug house." Neither party challenges that ruling on appeal. We therefore consider this evidence only for the limited purpose for which it was admitted. *See In re S.R.*, 452 S.W.3d 351, 362 n.4 (Tex. App.—Houston [14th Dist.] 2014, pet. denied).

G.D.P. correctly, she did not appear to be harming him, he was dressed appropriately, he did not have any visible scratches or bruises, and he did not appear to be malnourished. Kaske noted, however, that G.D.P. appeared "a little dirty," and Mother told her "he was hungry because he hadn't eaten for hours." Nevertheless, Mother was feeding G.D.P. when she brought him out of the house, from which Kaske inferred Mother had formula for the child.

CPS conservatorship caseworker Ashley Jarrett worked on both cases involving Mother's children. She testified Mother failed to submit herself to court-ordered drug testing in either case, despite Jarrett's requests.[4] Moreover, Mother failed to complete any of the court-ordered services in the G.D.P. case, which was concerning to Jarrett because, "[w]ithout working the services to mitigate the reasons for removal, she is not able to better her environment for a child to live safely." According to Jarrett, Mother never sought clarification concerning the requirements of the service plan.

In addition, Mother neither regularly visited nor maintained contact with G.D.P. after his removal.[5] In fact, when asked whether Mother had "shown any interest in [G.D.P.]," Jarrett responded: "No." Jarrett explained that Mother showed no willingness to cooperate with the Department in implementing the service plan, and she provided no support for G.D.P. after his removal. But Jarrett acknowledged she had no information concerning Mother's financial situation,[6] and the trial court never ordered Mother to pay support.

---

[4] Jarrett testified she contacted Mother in May 2019 and asked her to submit to a drug test in this case.

[5] According to trial testimony, Mother visited G.D.P. once, in February or March of 2019, but abruptly cut that visit short. Mother did not show up for other scheduled visits, and the trial court at some point suspended her visitation rights. According to testimony, it may have been sometime before Mother's February or March 2019 visit with the child (suggesting the Department allowed Mother to visit even though her visitation rights were suspended). But according to the record, the first written order suspending Mother's visitation rights was entered after the May 2019 permanency hearing. In any event, the court explained its reasoning for suspending visitation at the trial: "All I said was that if she wanted visits, she needed to show up, because I wasn't going to put the kid through it." Mother's trial counsel also acknowledged that "the judge indicated if [Mother] showed up to court, he might reconsider reactivating" visitation.

[6] Mother did not provide the Department with information concerning her financial situation, despite numerous written orders requiring her to provide CPS "with employment, DISABILITY and income information while the case is pending."

Jarrett visited G.D.P. in his foster home, and she believed he was doing very well there. She opined that terminating Mother's parental rights would be in G.D.P.'s best interest because of Mother's history of drug abuse and a pattern of behavior indicating an inability "to provide a drug-free, clean, and appropriate environment for her children."

CPS conservatorship caseworker Wesley Hibbitts took over the case while Jarrett was on leave. He tried to call Mother to request a drug test in July 2019, but he was unable to contact anyone at the two most recent phone numbers on file with the Department. Hibbitts received no information suggesting Mother completed any of the service-order requirements while he was assigned to the case.

Hibbitts also visited G.D.P. in his foster home, and the child had strongly bonded with his foster family. Hibbitts believed terminating Mother's parental rights was in G.D.P.'s best interest because the child was "placed in an adoptive home, which would lead to permanency and a lifelong family," as well as "provid[ing] him with a stable and safe environment." He also believed Mother's unwillingness to complete her services was detrimental to G.D.P.'s well-being and made it impossible for reunification.

Paula Stevens, a Court Appointed Special Advocate (CASA) representative, testified G.D.P. was "doing wonderful" in his foster home, noting that he was "very healthy," "very happy," and "well adjusted." G.D.P. bonded with his foster family, and the placement was meeting all of his physical and emotional needs. CASA therefore supported terminating Mother's parental rights to facilitate adoption by the foster family.

At the conclusion of the trial, Mother rested without presenting any evidence. The trial court took judicial notice of its file upon request, and G.D.P.'s ad litem formally recommended granting termination. After noting that neither Mother nor any of G.D.P.'s potential fathers appeared in person for the trial, the court terminated all of their respective parental rights and

appointed the Department as G.D.P.'s managing conservator. As to Mother, the trial court found termination was appropriate under sections 161.001(b)(1)(F), 161.001(b)(1)(N), 161.001(b)(1)(O), and 161.001(b)(2) of the Texas Family Code, stating:

> [Mother] has absolutely done nothing to indicate to the Court anything different than her complete disregard for this child, this case, her trying to get better, [and] her try[ing] to beat her addiction. . . . There is no doubt beyond a reasonable doubt it is in the best interest of this child for mom's rights to be terminated, effective today.

### Standards of Review

A trial court may terminate the parent-child relationship if it finds by clear and convincing evidence that: (1) one or more of the statutory grounds for termination enumerated in the Texas Family Code has been established; and (2) termination is in the child's best interest. TEX. FAM. CODE § 161.001(b). "Clear and convincing evidence" is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." FAM. § 101.007.

Our standards of review on appeal reflect the elevated burden of proof at trial. *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014); *In re A.T.*, 406 S.W.3d 365, 370 (Tex. App.—Dallas 2013, pet. denied). Both legal- and factual-sufficiency reviews require us to review the evidence to determine whether the factfinder reasonably could have formed a firm belief or conviction that the grounds for termination were established. *See In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002); *In re L.E.H.*, No. 05-18-00903-CV, 2018 WL 6839565, at *4 (Tex. App.—Dallas Dec. 31, 2018, no pet.) (mem. op.). The difference between the two reviews lies primarily in the manner in which we consider evidence contrary to a finding. *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018).

Our review of legal sufficiency requires us to view all the evidence in the light most favorable to the finding. *Id.* Thus, we assume the factfinder resolved all factual issues in favor of the finding and disregard all disputed evidence to the contrary. *Id.* at 630–31. Our review of factual

sufficiency, in contrast, requires us to weigh the disputed evidence contrary to the finding and determine whether, in light of the entire record, the evidence that could not reasonably be credited in favor of the finding is so significant that it would prevent the formation of a firm belief or conviction that the finding is true. *Id.* at 631. In applying this standard, we must be mindful not to scrutinize the evidence to the point where "the only factfindings that could withstand review are those established beyond a reasonable doubt." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

### The evidence is legally and factually sufficient to support the trial court's finding that Mother failed to comply with a court order under section 161.001(b)(1)(O).

In her first three issues, Mother challenges the legal and factual sufficiency of the trial court's termination findings under section 161.001(b)(1). A single finding under any of the grounds enumerated in section 161.001(b)(1) is sufficient to support termination. *In re N.G.*, 577 S.W.3d 230, 234 (Tex. 2019) (per curiam) ("[O]nly one ground is required to terminate parental rights . . . ."). Thus, if we conclude the evidence is legally and factually sufficient to support the trial court's finding under section 161.001(b)(1)(O), we need not address Mother's arguments under sections 161.001(b)(1)(F) and 161.001(b)(1)(N). *See id.*[7]

To terminate parental rights under section 161.001(b)(1)(O), the court must find: (1) the parent "failed to comply with the provisions of a court order"; (2) the order "specifically established the actions necessary for the parent to obtain the return of the child"; and (3) the child was under the managing conservatorship of the Department for at least nine months after being removed from the parent for abuse or neglect. FAM. § 161.001(b)(1)(O). Mother does not argue the evidence was insufficient as to the first or third requirements under section 161.001(b)(1)(O),

---

[7] In *N.G.*, the supreme court held that, because of the potential collateral consequences of a finding under sections 161.001(b)(1)(D) or 161.001(b)(1)(E), appellate courts must review challenges to those findings even if another ground is established. *See* 577 S.W.3d at 235–37. We are not presented with that situation here. In addition, because Mother does "not raise an issue under section 161.001(d), which provides exceptions to termination of parental rights under 161.001(b)(1)(O) . . . , we do not address section 161.001(d)" in this case. *Id.* at 239 n.2.

but contends the Family Service Plan, which was incorporated into the trial court's pre-trial orders, was not sufficiently specific as to the actions she needed to take to regain custody.

An order referenced by section 161.001(b)(1)(O) is sufficiently specific if its terms of compliance are set out with certainty so the parent knows what duties and obligations have been imposed. *See In re D.K.J.J.*, No. 01-18-01081-CV, 2019 WL 2455623, at \*14 (Tex. App.—Houston [1st Dist.] June 13, 2019, pet. denied) (mem. op.) (citing *In re N.G.*, 577 S.W.3d at 238). The court-ordered service plan, among other things, states:

> [Mother] must complete random drug & alcohol urinalysis/hair strand tests and oral swabs. CPS caseworker will contact [Mother] and instruct her to complete any type drug test requested at a location given within that same day; between the hours of 8am-5pm.
>
> Fas-Tes Labs of Plano
> 1104 Summit Ave. Plano, TX 75074
> PHONE: 469-661-9020
> Monday-Friday 9am-12pm and 1pm-5pm.

This provides specific information about what Mother must do to comply—that is, when contacted by CPS, she must complete a requested drug test that same day, between the hours of 8 a.m. and 5 p.m., at a specified location in Plano. We conclude the Family Service Plan's random-drug-test requirement is sufficiently specific to support the trial court's finding under section 161.001(b)(1)(O). *See id.* at \*14–15 (holding that a mother's failure to submit to the random drug tests ordered in a family-service plan was sufficient to sustain a finding under section 161.001(b)(1)(O)).

There was uncontroverted testimony at trial showing both that the Department contacted Mother to request a drug test and that she failed to comply. Of course, she failed to comply with *any* aspect of the court-ordered service plan. Under the appropriate standards of review, we conclude the evidence is legally and factually sufficient to support the trial court's finding under section 161.001(b)(1)(O). We overrule Mother's first three issues.

**The evidence is legally and factually sufficient to support the trial court's finding that termination was in the child's best interest.**

In her fourth issue, Mother contends the evidence is legally and factually insufficient to support the trial court's best-interest determination. A trial court's finding that termination is in a child's best interest is "not dependent upon, or equivalent to, a finding that the child has been harmed by abuse or neglect or is in danger of such harm." *In re T.C.*, No. 05-19-00262-CV, 2019 WL 3852657, at *6 (Tex. App.—Dallas Aug. 16, 2019, pet. denied) (mem. op.) (quoting *In re M.J.P.*, No. 05-16-01293-CV, 2017 WL 655955, at *6 (Tex. App.—Dallas Feb. 17, 2017, no pet.) (mem. op.)). Rather, a best-interest finding "encompass[es] a much broader, facts-and-circumstances based evaluation that is accorded significant discretion." *Id.*

Although we strongly presume that maintaining the parent-child relationship is in a child's best interest, *see In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), "the prompt and permanent placement of the child in a safe environment is [also] presumed to be in the child's best interest." FAM. § 263.307(a). As most relevant to this case, a court making a best-interest determination should consider: (1) "the child's age and physical and mental vulnerabilities"; (2) "whether there is a history of substance abuse by the child's family or others who have access to the child's home"; (3) "the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision"; (4) "the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time"; and (5) "whether the child's family demonstrates adequate parenting skills." *Id.* § 263.307(b).

The supreme court has also identified nine non-exclusive factors to consider when evaluating a best-interest determination:

> (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the person seeking custody; (5) the programs

available to assist the person seeking custody in promoting the best interest of the child; (6) plans for the child by the person seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate the parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)). "The absence of evidence about some of these considerations would not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). But termination should not be used merely as a means to "reallocate a child to better or more prosperous parents." *In re J.W.*, 152 S.W.3d 200, 207 (Tex. App.—Dallas 2004, pet. denied).

Here, Mother used methamphetamine while pregnant with G.D.P. and refused to submit to court-ordered drug tests following his removal. The trial court could therefore infer she continued to use illegal drugs against G.D.P.'s best interest. *See In re A.M.L.*, No. 04-19-00422-CV, 2019 WL 6719028, at *4 (Tex. App.—San Antonio Dec. 11, 2019, no pet.) (mem. op.) ("Father's failure to submit to drug testing, through which the trial court could infer Father's continued prescription drug abuse, is relevant to multiple *Holley* factors, including [the child's] emotional and physical needs now and in the future, the emotional and physical danger to [the child] now and in the future, Father's parental abilities, the stability of Father's home, and the acts or omissions which may indicate an improper parent-child relationship."); *In re K.J.B.*, No. 14-19-00473-CV, 2019 WL 5704317, at *7 (Tex. App.—Houston [14th Dist.] Nov. 5, 2019, no pet.) (mem. op.) ("[A] fact finder reasonably can infer that a parent's failure to submit to court-ordered drug tests indicates the parent was avoiding testing because the parent was using illegal drugs."); *In re Z.J.B.*, No. 14-18-00759-CV, 2019 WL 347474, at *5 (Tex. App.—Houston [14th Dist.] Jan. 29, 2019, pet. denied) (mem. op.) (recognizing as part of its best-interest analysis that the parent's failure to

complete scheduled drug tests weighed in favor of finding that termination was in the child's best interest).

Mother also failed to complete her court-ordered service plan for reunification. In this regard, she did not merely "fall short of strict compliance with [the] family-service plan's requirements"; she "simply refused to work any services at all." *In re A.S.*, No. 01-14-00113-CV, 2014 WL 3779022, at *11 (Tex. App.—Houston [1st Dist.] July 31, 2014, pet. denied) (mem. op.). She likewise refused to attend the trial court's proceedings, and she failed to maintain contact with the child. The uncontroverted evidence thus supports the trial court's conclusion that Mother demonstrated little regard for the child's welfare or for maintaining her parental relationship.

Uncontroverted evidence also shows G.D.P., who was removed from Mother's care when he was six-and-a-half weeks old, is thriving in his foster home. Witnesses described him as being strongly bonded with his foster family, who are the only family he has ever known. G.D.P.'s foster family is providing for all of his physical and emotional needs. And they plan to adopt him, which would provide a permanent home that appears both safe and stable. The Department's caseworkers, the CASA representative, and G.D.P.'s ad litem all agreed that terminating Mother's parental rights was in G.D.P.'s best interest. On this record, the trial court could reasonably develop a firm belief or conviction that termination was indeed in his best interest. *See In re J.F.C.*, 96 S.W.3d at 265–66 (Tex. 2002); *In re L.E.H.*, 2018 WL 6839565, at *4. We overrule Mother's fourth issue.

**Mother lacks standing to challenge the trial court's conservatorship appointment.**

In her fifth issue, Mother contends the trial court abused its discretion by appointing a nonparent as G.D.P.'s conservator. But "[a]n order terminating the parent-child relationship divests the parent of all legal rights and duties with respect to the child." *In re C.J.B.*, No. 05-19-00165-CV, 2019 WL 3940987, at *10 (Tex. App.—Dallas Aug. 21, 2019, no pet.) (mem. op.); *see*

*also* FAM. § 161.206(b). Because we uphold the portion of the trial court's order terminating Mother's parental rights, Mother lacks standing to challenge the portion of the order appointing the Department as G.D.P.'s managing conservator. *See In re C.J.B.*, 2019 WL 3940987, at \*10. We overrule Mother's fifth issue.

Having overruled each of Mother's issues, we affirm the trial court's judgment terminating Mother's parental rights and appointing the Department as G.D.P.'s managing conservator.


/Cory L. Carlyle/
CORY L. CARLYLE
JUSTICE


191068F.P05



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

IN THE INTEREST OF G.D.P., JR., A
CHILD

No. 05-19-01068-CV

On Appeal from the 296th Judicial District
Court, Collin County, Texas
Trial Court Cause No. 296-30053-2018.
Opinion delivered by Justice Carlyle.
Justices Pedersen, III and Reichek
participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is
**AFFIRMED**.

Judgment entered this 24th day of January, 2020.