

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-20-00511-CV

**IN THE INTEREST OF A.M.M.**, a Child

From the 73rd Judicial District Court, Bexar County, Texas
Trial Court No. 2019PA02102
Honorable John D. Gabriel, Jr., Judge Presiding[1]

Opinion by:    Luz Elena D. Chapa, Justice

Sitting:    Rebeca C. Martinez, Chief Justice
Luz Elena D. Chapa, Justice
Irene Rios, Justice

Delivered and Filed: April 14, 2021

AFFIRMED

This is an accelerated appeal from a trial court's order terminating the parent-child relationship. Appellant, A.H., appeals the trial court's order terminating her parental relationship with A.M.M., arguing the evidence was legally and factually insufficient to support the grounds for termination as well as the trial court's best-interest finding.[2] We affirm the trial court's order.

## BACKGROUND

On October 16, 2019, the Department of Family and Protective Services filed an original petition, seeking temporary managing conservatorship of A.M.M. and termination of the parental rights of both of A.M.M.'s parents, A.H. (Mother) and U.M. (Father). The affidavit in support of

---

[1] Senior Judge sitting by assignment.
[2] To protect the identity of the minor child, we refer to appellant and the child by initials or pseudonyms. *See* TEX. FAM. CODE § 109.002(d); TEX. R. APP. P. 9.8.

the petition stated the Department received an intake alleging neglectful supervision of A.M.M. by both parents. The affidavit further stated while Mother was experiencing an episode of schizophrenia, she left the Haven for Hope homeless shelter unannounced without providing any contact information or details of her whereabouts. Father tested positive for methamphetamines and amphetamines on October 11 and October 15, 2019, while A.M.M. was in his care. The trial court rendered an order of protection for A.M.M., named the Department temporary managing conservator, and appointed an attorney and guardian ad litem.

The case proceeded to a bench trial approximately one year later. The evidence at trial included the parents' family plans and the testimony of four witnesses—the initial investigator, the primary caseworker, Mother, and Foster Mother. Father did not participate in the trial. The court terminated the parental rights of Mother and Father. With respect to Mother, the court found the Department established by clear and convincing evidence the grounds for termination set forth in subsections (D), (E), (N), (O), and (P) of Section 161.001(b)(1) of the Texas Family Code. The court also found by clear and convincing evidence that it was in A.M.M.'s best interest to terminate Mother and Father's parental rights.

Mother timely appealed the trial court's order. She argues the evidence presented by the Department was not legally or factually sufficient to support the grounds for termination or to support the court's best-interest finding. The Department argues the evidence presented at trial was legally and factually sufficient to support the court's determination. Father did not appeal.

### STANDARD OF REVIEW AND APPLICABLE LAW

In assessing the legal and factual sufficiency of the evidence to support the trial court's findings, we employ a heightened standard of review to determine whether the trial court could have formed a firm belief or conviction about the truth of the Department's allegations. *In re J.F.C.*, 96 S.W.3d 256, 266–67 (Tex. 2002). Under this standard, the trial court is the sole judge

of the weight and credibility of the evidence, including the testimony of the Department's witnesses. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009). To give proper deference to the factfinder's role, we must assume it resolved disputed evidence in favor of its findings if a reasonable factfinder could have done so. *Id.* at 344.

In our legal sufficiency review, we review the evidence in the light most favorable to the finding and disregard all evidence that a reasonable factfinder could have disbelieved or found incredible. *J.F.C.*, 96 S.W.3d at 266. However, we must consider undisputed or uncontradicted evidence in our review, even if that evidence does not support the trial court's finding. *Id.* When conducting a factual sufficiency review, we consider the entire record. *Id.* Rather than disregard disputed evidence that a reasonable factfinder could not have credited in favor of the finding, we must determine whether, in light of the entire record, that evidence "is so significant that a factfinder could not reasonably have formed a firm belief or conviction" that the finding was true. *Id.*

### DISCUSSION

**A. Legal and Factual Sufficiency of the Evidence to Support Grounds for Termination under § 161.001(b)(1)(D) & (E)**

The trial court terminated Mother's parental rights pursuant to grounds (D), (E), (N), (O), and (P). When a parent challenges findings under subsection (D) and/or subsection (E), we must address those grounds even if there are other predicate grounds because of the potential future consequences for parental rights to another child. *In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019) ((D) and (E) must be reviewed if challenged on appeal, regardless of whether sufficient evidence exists to support another predicate ground, because endangerment finding under (D) or (E) may be used in future termination proceeding involving different child).

### 1. Evidence Related to Subsection (D)

In her first issue, Mother argues the evidence was not legally and factually sufficient to support termination under section 161.001(b)(1)(D) of the Texas Family Code. In order to terminate parental rights pursuant to subsection (D), the Department must prove by clear and convincing evidence that the parent knowingly placed the child in or allowed the child to remain in conditions or surroundings that endangered the child's physical or emotional well-being. *See In re I.N.D.*, No. 04-20-00121-CV, 2020 WL 2441375, at *3 (Tex. App.—San Antonio May 13, 2020, pet. denied) (mem. op.).

"Conditions or surroundings" establishing endangerment include "[i]nappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis." *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.). "Endanger," as used in section 161.001(b)(1)(D), means to expose to loss or injury or to jeopardize a child's emotional or physical health. *See Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987) (construing predecessor statute). An environment that endangers the child may be created by the physical living conditions in the child's home or by the conduct of a parent living in the home. *In re R.S.-T.*, 522 S.W.3d 92, 108–09 (Tex. App.—San Antonio 2017, no pet.). A parent knowingly places or allows a child to remain in an endangering environment when the parent is aware of the potential danger but disregards it. *M.R.J.M.*, 280 S.W.3d at 502. Thus, a child may be endangered when the home environment creates a potential for emotional or physical injury; the injurious conduct does not need to be directed at the child and the child does not need to suffer injury in order for the requirements of subsection (D) to be met. *Boyd*, 727 S.W.2d at 533; *I.N.D.*, 2020 WL 2441375, at *3. Evidence of endangerment may include, among other things, domestic violence, want of self-control, and propensity for violence.

*R.S.-T.*, 522 S.W.3d at 110 (quoting *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.)).

The Department's investigator, Jody Dowling, testified Mother admitted she knew Father was using methamphetamines and, even so, she left three-month old A.M.M. with Father when she voluntarily admitted herself to the San Antonio State Hospital. Mother argues in her brief she had no knowledge Father would use methamphetamines while she was absent, and argues there was no evidence Father was in close proximity to A.M.M. when he used drugs. However, subsection (D) does not require Father's drug use to have occurred in A.M.M.'s presence; the ground is established if A.M.M. was exposed to the potential for injury as a result of Mother's knowing actions or omissions. *See M.R.J.M.*, 280 S.W.3d at 502. The testimony at trial established Mother knew Father was using methamphetamines, she used methamphetamines with Father, triggering her paranoia and delusions, and she left A.M.M. with Father, placing the child at risk. There was also evidence at trial that Father had a history of domestic violence. Both Mother and Caseworker Davis testified Mother was twice hospitalized as a result of Father's physical abuse, rendering her temporarily unable to walk after one incident. Mother's decision to leave A.M.M. in Father's care, knowing his history of physical abuse, also created a potential for the child's emotional or physical injury.

Mother also argues A.M.M. was left in a safer environment with Father than with her, and she argues this is supported by Dowling's testimony that A.M.M. was found in Father's custody to be physically and visibly fine. Although Mother may have intended to do the responsible thing by removing herself from A.M.M, she nevertheless endangered the child by leaving him with Father.

On this record, we hold the trial court could have formed a firm belief or conviction that Mother knowingly placed or allowed A.M.M. to remain in conditions or surroundings that

endangered the child's physical or mental well-being when Mother placed A.M.M in Father's care, knowing Father used methamphetamines and had committed acts of domestic abuse. *See* TEX. FAM. CODE § 161.001(b)(1)(D); *In re J.F.C.*, 96 S.W.3d 256, 261 (Tex. 2002). We therefore hold the evidence is both legally and factually sufficient to support the trial court's endangerment finding under subsection (D).

### 2. Evidence Related to Subsection (E)

In her second issue, Mother argues the evidence was not legally and factually sufficient to support the trial court's finding that she engaged in conduct or knowingly placed A.M.M. with a person who engaged in conduct that endangered the child's physical or emotional well-being. *See* TEX. FAM. CODE § 161.001(b)(1)(E). Specifically, she argues the Department has not proven a course of conduct that endangered A.M.M. because she was forthcoming about her prior methamphetamine and other drug use, submitted to at least three different drug and alcohol assessments, and never tested positive for anything other than alcohol. The Department argues Mother's continued drug and alcohol abuse was grounds for termination under subsection (E). It also contends Mother did not complete any drug and alcohol treatment programs, she was a no show for five of seven required urinalyses, and she tested positive for alcohol during one urinalysis—after which she admitted she consumed alcohol. The Department further argues Mother's move from San Antonio to Comanche, Oklahoma in November 2019 followed by her move to Tulsa in Spring 2020, made it impossible for her to receive treatment paid for by the Department and made it difficult, if not impossible, for the Department to monitor her drug and alcohol treatment compliance.

Under section 161.001(b)(1)(E), the term endangerment has the same definition as in section 161.001(b)(1)(D), but the grounds of subsections (D) and (E) are otherwise different. *See Boyd*, 727 S.W.2d at 533. Termination under subsection (E) must be based on more than a single

act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *In re J.W.*, 152 S.W.3d 200, 205 (Tex. App.—Dallas 2004, pet. denied). The course of conduct may include both the parent's actions and failures to act. *In re M.J.M.L.*, 31 S.W.3d 347, 351 (Tex. App.—San Antonio 2000, pet. denied). Scienter is not required for a parent's own acts or omissions; proof of the parent's knowledge is required only when the allegation is that the parent placed the child with others who endangered the child. *In re K.J.G.*, No. 04-19-00102-CV, 2019 WL 3937278, at *4 (Tex. App.—San Antonio Aug. 21, 2019, pet. denied) (mem. op.).

The Department does not have to prove that the parent directed the endangering conduct at the child, that it was done in the presence of the child, or that the parent caused an actual injury or threat of injury to the child. *Boyd*, 727 S.W.2d at 533; *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 616-17 (Tex. App.—Houston [1st Dist.] 2009, pet. denied); *M.J.M.L.*, 31 S.W.3d at 350. The danger to the child's well-being may be inferred from the nature of the parent's misconduct alone. *Boyd*, 727 S.W.2d at 534. Thus, in considering whether a course of conduct that endangers the child's physical or emotional well-being has been established, the court may consider evidence of the parent's conduct both before and after the child's birth, including conduct occurring after the child was removed from the parent's care. *K.J.G.*, 2019 WL 3937278, at *4; *Walker*, 312 S.W.3d at 617. "Evidence of illegal drug use or alcohol abuse by a parent is . . . conduct which will support an affirmative finding that the parent has engaged in a course of conduct which has the effect of endangering the child." *In re S.N.*, 272 S.W.3d 45, 52 (Tex. App.—Waco 2008, no pet.).

Mother testified she used methamphetamines along with other controlled substances and had a long history of drug abuse beginning when she was a teenager. She further testified the last time she used methamphetamines was the same day she was admitted to San Antonio State Hospital for mental health and substance abuse treatment on October 13, 2019. Davis testified that

after Mother was discharged from San Antonio State Hospital, she completed multiple drug and alcohol use disorder assessments in San Antonio and Oklahoma concluding she required in patient or outpatient treatment for a substance use disorder. However, Mother never completed any recommended programs. She explained she did not complete treatment because, among other things, other patients were abusive, she relocated to Tulsa from Comanche, and in-patient treatment conflicted with her work schedule.

The Department asked Mother to submit to seven separate drug tests, and the family plan expressly stated that a failure to appear or to submit a sample when requested would be treated as an automatic positive test result for drugs. Mother submitted to two of the seven drug tests. Mother claimed she missed many of the tests because she could not afford them.

Mother further testified she no longer abused alcohol but conceded alcohol abuse had been an issue throughout her life, and she was taking Naltrexone to avoid a relapse. Mother's most recent provider conducted a urinalysis in August 2019—two months before trial. Mother tested positive for alcohol, after having told the provider she had not consumed alcohol recently. At trial, Mother admitted she had lied and testified she drank one beer the evening before the test to alleviate back pain from work because she did not have health insurance, ibuprofen did not alleviate the pain, and "what would one beer hurt."

Mother testified she had been sober since October 13, 2019, the day she entered San Antonio State Hospital, referring to the lack of a positive drug test in the year since she was discharged from the hospital. She further testified she "learned how to cope" with her drug addiction problem. It is undisputed that Mother did not test positive for anything other than alcohol while the case was pending, and there is no other evidence of any illegal drug use after her release from San Antonio State Hospital in November 2019. However, based on the entire record, including Mother's failure to appear for requested drug tests and submit samples, her lying with

respect to her positive alcohol test, her history of drug and alcohol abuse, and her failure to complete a treatment program, a rational trier of fact could have inferred Mother continued to abuse drugs and alcohol after A.M.M. was removed and could have discredited Mother's testimony that she had been sober for over a year and had learned how to cope with her drug addiction. *See Smith v. Tex. Dep't of Fam. & Protective Servs.*, No. 01-09-00173-CV, 2009 WL 4359267, at *10 (Tex. App.—Houston [1st Dist.] Dec. 3, 2009, no pet.) (mem. op.) (concluding rational trier of fact could have inferred from appellant's refusal to take court-ordered drug test that she was using drugs and could have disbelieved appellant's testimony that she used illegal drugs only once).

Mother argues her case is similar to *In re A.G.K.*, No. 04-16-00315-CV, 2016 WL 6775590 (Tex. App.—San Antonio Nov. 16, 2016, no pet.) and *Wetzel v. Wetzel*, 715 S.W.2d 387, 390 (Tex. App.—Dallas 1986, no pet.). The facts of those cases are distinguishable from the facts here. In *A.G.K.*, the court concluded the mother's previous drug use did not support termination because Mother rehabilitated herself, remained drug free for many years, and there was no evidence drug use was a current or future threat to the children. *A.G.K.*, 2016 WL 6775590, at *4. In *Wetzel*, the mother suffered from mental disorders and physically abused the children. 715 S.W.2d at 390. The evidence showed she had been treated successfully, and no evidence was presented that she was currently abusing the children or might in the future. *Id.* In this case, despite repeated assessments concluding she required in patient or outpatient treatment, Mother started but never completed any treatment, and the evidence supports she continued to use illegal drugs and alcohol.

We conclude the trial court could have formed a firm belief or conviction about the truth of the State's allegation that termination of Mother's parental rights on the grounds of subsection (E) was proper because Mother's continued drug and alcohol use was a course of conduct that endangered A.M.M.'s physical or emotional well-being. We therefore hold the evidence is both

legally and factually sufficient to support the trial court's finding under section 161.001(b)(1)(E) of the Texas Family Code.

Because a finding of only one predicate ground is necessary and because we conclude the evidence is sufficient to support the trial court's finding under subsections (D) and (E), we do not address the trial court's findings under subsections (N), (O), or (P). *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

### B. Legal and Factual Sufficiency of the Evidence in Support of the Best Interest of A.M.M. Pursuant to Texas Family Code § 161.001(b)(2)

Mother argues the evidence is not legally and factually sufficient to support the trial court's best-interest finding. To terminate parental rights, a trial court must find by clear and convincing evidence one of the statutory predicate grounds and that termination is in the child's best interest. TEX. FAM. CODE § 161.001(b)(2). Under Texas law, there is a strong presumption that the best interest of a child is served by keeping the child with a parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). However, a court must also presume that "the prompt and permanent placement of the child in a safe environment is . . . in the child's best interest." TEX. FAM. CODE § 263.307(a). In making a best-interest determination, the factfinder looks at the entire record and considers all relevant circumstances. *See In re C.H.*, 89 S.W.3d 17, 27-29 (Tex. 2002).

In determining the best interest of a child, a court should consider the factors set out in section 263.307 of the Family Code.[3] Courts also apply the non-exhaustive *Holley* factors. *See*

---

[3] These factors include: the child's age and physical and mental vulnerabilities; the frequency and nature of out-of-home placements; the magnitude, frequency, and circumstances of the harm to the child; whether the child has been the victim of repeated harm after intervention by the department; whether the child is fearful of returning to the child's home; the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; whether there is a history of abusive conduct by the child's family or others who have access to the child's home; whether there is a history of substance abuse by the child's family or others who have access to the child's home; the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; whether the child's family demonstrates adequate parenting skills; and whether an

*Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). Those factors include: (1) the desires of the child; (2) the present and future emotional and physical needs of the child; (3) the present and future physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans held by the individuals seeking custody; (7) the stability of the home of the parent and the individuals seeking custody; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Id.* This list of factors is not exhaustive, and not every factor must be proven for a court to find that termination is in the child's best interest. *C.H.*, 89 S.W.3d at 27. Evidence of only one factor may be sufficient to support the best interest finding, especially if the evidence shows the parental relationship endangered the child's safety. *See id.*

### 1. History of Substance Abuse and Domestic Violence

The evidence at trial showed Mother struggled to complete drug treatment programs, skipped multiple drug tests knowing they would be treated as a positive test result for drugs, but maintained she had learned to manage her addiction. Caseworker Davis testified Mother has not demonstrated an ability to change the behavior that led to the removal of A.M.M. Mother was unable to comply with the drug and alcohol treatment and testing requirements in the family plan, and she left A.M.M. in Father's care, who she knew used methamphetamines and who tested positive for them while A.M.M. was in his care. Davis testified Mother was encouraged to return to San Antonio because the Department could not offer her services in Oklahoma. Davis further testified Mother chose out-of-state work over getting treatment for her substance use disorder.

---

adequate social support system consisting of an extended family and friends is available to the child. *See* TEX. FAM. CODE § 263.307.

Although Mother did not comply with the family plan's requirement to submit to random drug tests, she testified she had demonstrated through her two negative drug tests that she had learned to cope with her substance use disorder. Mother minimized her alcohol use during her testimony, admitting she tested positive for it, but stating it was because she consumed a single beer the previous evening for back pain. She testified the Department refused to help her complete a drug program after she relocated to Oklahoma. Mother further testified she was unable to complete drug treatment programs because other patients bullied her, she relocated to Tulsa from Comanche to live with her boyfriend, and she had work schedule conflicts. After failing to participate in several drug treatment programs, Mother began an outpatient treatment program a few months before trial, attending AA and NA meetings. However, Mother conceded during her testimony that she was informed the AA and NA meetings were not sufficient to satisfy her obligations under the family plan. Mother nevertheless claimed she could not complete other such services because she was being treated by one organization and could not "double-dip" with another organization.

As noted above, Father physically abused Mother to the point of hospitalization. Mother testified she concealed Father's domestic violence because she did not want to have to choose between Father and A.M.M. Davis advised Mother she should attend domestic violence classes, but Mother indicated she had not sought any classes or counseling for it.

We conclude the evidence supports Mother has not taken sufficient steps toward addressing her drug and alcohol use disorders or her domestic violence experience, and these factors weigh strongly in favor of the trial court's finding it is in the best interest of A.M.M. to terminate Mother's parental rights.

## 2. Mother's History of Mental Illness

Mother has a long history of mental illness that she manages through prescription medication but without counseling or therapy. Mother testified she has been diagnosed with bipolar disorder, and she attempted suicide a few years before A.M.M. was born. She further testified she left A.M.M. and Father at Haven for Hope to check herself into the San Antonio State Hospital because she was experiencing paranoia and delusions that may have been induced by methamphetamines, causing her to hear loud voices. She takes prescription medication for her mental illness, but she still hears quieter voices frequently, although not daily. Davis testified he knew Mother was taking medication to maintain her mental health and was unaware of Mother having any mental health episodes since the case was pending. He further testified Mother completed a psychosocial evaluation, but she did not attend counseling and therapy regularly. Mother began counseling at Chisholm Trail Church of Christ in early 2020, but she attended only three sessions. Mother testified that after she moved to Tulsa, Davis recommended she find local counseling. In Tulsa, she started counseling with Catholic Charities in July 2020 but skipped some sessions. She testified she missed counseling sessions at Catholic Charities because she failed to pay her phone bill and slept through one session because she works night shifts. She admitted she also did not attend her session the week before the trial.

The evidence establishes that Mother manages her mental illness with medication, but she does not attend counseling regularly. This factor is neutral with respect to the trial court's best-interest finding.

## 3. Mother's Visits with A.M.M.

Davis testified Mother had no contact with A.M.M. beginning from the date of removal through May 2020 and had sporadic visits with the child thereafter. Davis scheduled visits with A.M.M. in person between January and May 2020, but Mother had no visits with A.M.M. during

that time. Davis scheduled ten virtual visits for Mother and A.M.M. between May and July 2020, but she only fully attended five, was late for two, and missed three of them. Mother had one in-person visit with A.M.M. in September, but she spent the majority of time trying to find a place for them to visit because a number of parks were closed. During the visit, Mother did not feed A.M.M. or change his diaper. After the visit, Davis asked Mother to return for another visit, but she declined to do so. Mother did not address why she did not seek to visit with A.M.M. before she left San Antonio for Oklahoma in November 2019, but she testified she did not have the money to make in person visits with A.M.M. after she moved to Oklahoma.

The evidence does not support Mother has taken steps to make consistent visits and form any bond with A.M.M., and this factor heavily weighs in support of the trial court's best-interest finding.

### 4. The Present and Future Needs of A.M.M.

A.M.M. requires physical therapy, occupational therapy, and speech therapy twice a month. Foster Mother ensures A.M.M. receives the therapy and, at the time of trial, was seeking a referral for a developmental disability specialist. Davis testified Mother would not be able to meet the physical and emotional needs of A.M.M. and would be a danger to the child if returned to her. Davis also testified Mother completed a parenting class but had not otherwise demonstrated the ability to parent. Mother testified she knew A.M.M. had special needs, but had not established any childcare plans, and testified Davis had been vague about A.M.M.'s needs.

The evidence does not support Mother has taken steps to familiarize herself with the developmental needs of A.M.M. or to prepare for the child's care in that regard. This factor also heavily weighs in support of the trial court's best-interest finding.

### 5. A Stable Home and Support System

Although Mother has a suitable home, she has struggled to maintain a steady job and does not have a meaningful relationship with her Oklahoma family. Davis testified Mother had housing suitable for A.M.M. in Tulsa with her boyfriend. He further testified Mother has had sporadic employment, with nothing lasting longer than a few months. Davis also testified Mother's support network in Tulsa consisted of only her boyfriend because she was estranged from her family.

Mother testified she had three different jobs between February and September 2020, not lasting more than a couple of months at any of them. She testified she left them for various reasons including low pay, seasonal work, and relocating across Oklahoma. Three weeks before trial, she began working a night shift at a retail store warehouse. Mother also received food stamps and had been able to save money and buy a crib, car seat, and baby toys for A.M.M. However, she did not provide any financial support for A.M.M. between November 2019 and May 2020 and the record is not clear for the time period thereafter. Mother also does not have health insurance, but she testified her current employer has a good health insurance program. Finally, she testified her support system consisted of her boyfriend, friends, and her boyfriend's family.

The evidence supports Mother has a suitable home for A.M.M., but she has struggled to maintain a stable job, has moved frequently, and has a support system in Tulsa but is estranged from her family. This factor is neutral with respect to the trial court's best-interest finding.

### 6. Desires of A.M.M.

A.M.M. was three months old at the time of removal and fifteen months old at the time of trial. When, as here, a child is too young to express his desires, the trial court may consider whether the child has bonded with current caregivers, is well cared for by them, and has spent minimal time with the parent. *See In re D.A.B.*, No. 04-19-00629-CV, 2020 WL 1036433, at *7 (Tex. App.—San Antonio Mar. 4, 2020, no pet.) (mem. op.). Davis declined to say whether Mother and A.M.M.

had developed a bond because A.M.M. was an infant, but he testified Mother was "appropriate" during their visits. The testimony at trial established Mother had few virtual visits with A.M.M. and only one in-person visit after which she declined additional visits.

A.M.M. is thriving with Foster Mother—who has cared for the child since he was removed from his parents. Foster Mother testified she and A.M.M. have bonded, she sees the child as her own, and she would like to formalize adoption. She testified A.M.M. was very quiet upon arrival, but the child is now very outgoing. She hosted a small first birthday party for A.M.M. with some virtual attendees.

Having reviewed all of the evidence, we conclude the trial court could reasonably have formed a firm belief or conviction that termination of Mother's parental rights is in A.M.M.'s best interest, and the evidence is therefore legally and factually sufficient to support that finding. *See In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002).

## CONCLUSION

We conclude the evidence is legally and factually sufficient to support the trial court's findings that termination of Mother's rights was warranted under sections 161.001(1)(D), (E), and (2) of the Family Code. We therefore affirm the trial court's order terminating A.H.'s parental rights.

Luz Elena D. Chapa, Justice